The undersigned have reviewed the prior Opinion and Award based upon the record of the proceedings before Deputy Commissioner Kim Cramer. The appealing party has not shown good ground to reconsider the evidence, receive further evidence, rehear the parties or their representatives, or amend the Opinion and Award.
The Full Commission finds as fact and concludes as matters of law the following, which were entered into by the parties at the hearing as:
STIPULATIONS
1. Defendant/employer, J. H. Construction, Inc. regularly employs three or more employees and is bound by the North Carolina Workers' Compensation Act.
2. Defendant J. H Construction, Inc. was self-insured for workers' compensation at the time of plaintiff's alleged injury by accident, with Consolidated Administrators as the servicing agent.
3. Plaintiff claims he sustained a compensable injury to his right shoulder, wrist and hand arising out of an accident which occurred in the course and scope of his employment with defendant J. H. Johnson Construction, Inc. Defendant denies that plaintiff sustained an injury by accident while in the course and scope of his employment and further contends that plaintiff has not suffered any compensable wage loss.
* * * * * * * * * * * * * * * * * *
The Full Commission adopts the findings of fact found by the Deputy Commissioner as follows:
FINDINGS OF FACT
1. Plaintiff has worked as a professional painter for about 17 years. In 1991 plaintiff had an average weekly wage of $555.87.
2. Defendant J. H. Johnson Construction, Inc. is a residential general contractor. James Johnson has been in charge of the company since December 1984. Defendant is self-insured for workers' compensation through the North Carolina Home Builders Self Insurance Fund.
3. In 1991, defendant J. H. Johnson Construction, Inc. entered a contract with Pat Dyer under which defendant would complete two additions to her house. The contract called for complete painting of the new additions and painting of all the exterior trim work of the house, including the trim of the original structure, including doors, window frames, and molding. Sanding and caulking as needed would also be done. The siding on the Dyer house was latex paint, while the trim was oil-based. The contract called for one coat of oil-based paint on all exterior trim.
4. Due to the unavailability of the original painting sub-contractor, Greg Sames, James Johnson contacted plaintiff, with whom he had not previously worked, about painting the exterior of the Dyer house. Plaintiff submitted a bid of $2,200 for the paint job, which included pressure wash and prime, caulk and glaze as needed, one coat of exterior oil on the trim and one coat of exterior blue paint on the new addition with garage doors not included. Johnson accepted this bid, and thereby contracted with plaintiff to do the exterior painting.
5. Plaintiff did not furnish defendant J. H. Johnson Construction, Inc. a certificate of insurance showing plaintiff had workers' compensation coverage. For purposes of their yearly audit with the self-insured fund, defendant listed plaintiff as an uninsured sub-contractor.
6. After entering the contract with Johnson, plaintiff spoke directly with Pat Dyer and recommended that she change the trim from oil-based paint to latex and that he should to paint the entire original house so the blue would match the addition. He would need to prime the old trim for the latex paint. Plaintiff submitted a bid directly to Pat Dyer to do this work for $1,172.85, and she agreed, so that plaintiff and Dyer entered into a contract, separate and apart from plaintiff's contract with J. H. Johnson Construction. Defendant was not involved in these discussions or made a party to this contract. Dyer paid plaintiff $500 directly as an advance under her contract with him.
7. On Friday, December 13, 1991, plaintiff knew Pat Dyer did not want him to paint the trim that day. She planned to leave town around noon and could not be home to shut the windows. Plaintiff anticipated bad weather the next week and so he decided to paint anyway. Plaintiff arrived around 8 a.m. and while Dyer was not around, he set up and began painting.
8. When Dyer returned home around 9:30 a.m. she found plaintiff and several others painting. Plaintiff was at an upstairs window, painting the trim. Dyer went upstairs, opened the window and asked plaintiff why he was there. She told him she did not want the trim painted that day since she would not be home to close the windows. Plaintiff told her that if he had to take down his scaffolds and return the next week to finish, it would cost her more money. The discussion escalated into a heated verbal exchange and Dyer told plaintiff to leave the premises immediately. Dyer slammed the window closed and plaintiff threw his paint brush into the bucket causing paint to splatter.
9. Both plaintiff and Dyer were upset. Dyer demanded that plaintiff leave the paint in her garage since she had already advanced funds to pay for it. Plaintiff's crew put the paint into Dyer's garage, where it had previously been stored and Dyer closed the garage door.
10. Plaintiff had his equipment loaded and was ready to leave, when he realized that a can of his primer had been left in the garage along with the paint. This was not material that Dyer had paid for, but which plaintiff had purchased and could use on other jobs.
11. Plaintiff went to the side garage door and banged on it. Pat Dyer came to the door and opened it slightly. Plaintiff placed his foot on the threshold so that Dyer could not close the door and told her he wanted to get his paint, and then he tried to push the door open. Dyer put her hand on his chest and told him he could not come in. Dyer then pushed the door to close it, pushing it into plaintiff's right shoulder.
12. Plaintiff called the sheriff, and after the sheriff arrived, plaintiff's primer was retrieved from the garage. After the confrontation with plaintiff, Dyer did not want plaintiff working at her house again. James Johnson paid plaintiff for the work he had done under his contract with Johnson, as well as his contract with Dyer and then arranged for Greg Sames to complete the exterior painting of plaintiff's house.
13. The closing of the door into plaintiff's right shoulder by Pat Dyer was an accident in that it was an interruption of plaintiff's normal work routine by an unlooked for and untoward event not expected or designed by plaintiff. The accident was the culmination of the confrontation between plaintiff and Dyer which began at the upstairs window. On the date this occurred plaintiff was painting the window trim, which was required under both plaintiff's contract with Johnson and plaintiff's contract with Dyer. Since, on December 13, 1991, plaintiff was performing work under both contracts, the accident which occurred that day arose out of and in the course of his employment with defendant J. H. Johnson Construction, Inc. Plaintiff was in the process of retrieving his primer, part of his materials, from the worksite when the accident occurred. This was a reasonable part of the work he was required to perform under the contract with defendant.
14. Plaintiff had pre-existing shoulder problems for at least five years prior to the accident of December 13, 1991. In August 1986, plaintiff had been seen at Bowman Gray School of Medicine, where it was determined that he had tendonitis of the elbows and probable subacromial bursitis with element of rotator cuff involvement in both shoulders, right greater than left. In July 1987, plaintiff fell off a ladder about 15 feet, and sustained a strain to his neck, right shoulder and rib area. However, plaintiff did not seek medical treatment again for these problems until after the December 13, 1991 accident.
15. On December 16, 1991, plaintiff went to see Dr. Michael King, an orthopedic surgeon. He told Dr. King he had been struck in the shoulder by a door at work and related a history of right shoulder pain for the three days since this incident.
16. As revealed by Dr. King's examination, plaintiff had sustained an AC joint sprain and had rotator cuff tendonitis, as well as acute subacromial bursitis, which together are known as impingement syndrome. These injuries are consistent with and could have been caused by the door striking plaintiff's right shoulder as he described it to Dr. King.
17. Plaintiff is about 6 feet 4 inches tall and weighs 200 pounds. Pat Dyer is considerably smaller than plaintiff and has severe arthritis. As unlikely as it may seem on its face, as established by the medical evidence, and particularly the testimony of Dr. King, which was not contradicted by any other medical opinion, the accident of December 13, 1991, when Pat Dyer pushed the door into plaintiff's right shoulder, caused or materially aggravated plaintiff's right shoulder injuries.
18. On December 13, 1991, plaintiff sustained an injury by accident arising out of and in the course of his employment with defendant when Pat Dyer pushed the side garage door into his right shoulder.
19. Plaintiff was treated conservatively for several months, but still continued to show symptoms of tenderness at the AC joint. On July 10, 1992, plaintiff underwent arthroscopy by Dr. King for decompression of the right shoulder and resection of the distal clavicle. This procedure prevents the bones from abutting each other and creates more space in the joint and thus relieves pain. Plaintiff was unable to engage in active work, or otherwise earn wages, for ten days following this surgery, after which he could return to work in a supervisory capacity while he began weightlifting to rehabilitate his shoulder, so that he could began painting again.
20. In early 1992, plaintiff contracted with the Arbors apartments to repaint over 400 apartments. This was the largest and most profitable contract plaintiff had entered. He hired Steve Usher to assist him, and while plaintiff continued to paint, doing mostly trim work, Usher did most of the spray work. Otherwise, plaintiff acted more in a supervisory capacity.
21. On his June 4, 1992 visit to Dr. King, plaintiff complained that his right wrist and low back were bothering him due to overworking them. In follow-up after his shoulder arthroscopy, on October 5, 1992, plaintiff complained to Dr. King that he had pain in his right hand since September 1, 1992, radiating up his arm and that he noticed this pain more when painting. In his visit to Dr. King on December 7, 1992, plaintiff had a positive Tinel's test at the right wrist and mildly positive Phalen's test. It was subsequently determined that plaintiff had developed carpal tunnel syndrome in his right hand.
22. As unlikely as it may seem on its face, as established by the medical evidence, and particularly the testimony of Dr. King, which was not contradicted by any other medical opinion, the accident of December 13, 1991 caused plaintiff's carpal tunnel syndrome of his right hand. Plaintiff's carpal tunnel syndrome resulted from overuse of his right arm and right wrist as plaintiff tried to compensate for his injured right shoulder.
23. Plaintiff was treated conservatively for his carpal tunnel syndrome for almost a year, but continued to complain of numbness and pain in his hand. On June 15, 1993, Dr. King performed an outpatient carpal tunnel release on plaintiff's right hand.
24. As of September 8, 1993, plaintiff had reached maximum medical improvement as to both his shoulder and his right hand. As a result of his injury by accident of December 13, 1991, he sustained a ten percent permanent impairment to his right upper extremity and a fifteen percent permanent impairment to his right hand.
25. In spite of his shoulder injury and his carpal tunnel syndrome, plaintiff was able to continue his painting business. Plaintiff hired assistants as needed to do the painting he had difficulty doing, such as using a sprayer. Plaintiff continued to do some painting such as trim work and acted in a supervisory capacity. As of the date he reached maximum medical improvement, plaintiff was capable of working as a painter.
26. In 1991, plaintiff earned $28,905 in net profits from his painting business. In 1992, plaintiff earned net profits of $76, 907, and in 1993 he earned net profits of $56,212. Plaintiff earned more money in the two years immediately following the accident that he did the year before. Therefore, plaintiff did not suffer any diminution of his wage earning capacity as a result of the injury by accident of December 13, 1991.
* * * * * * * * * * * * * * * * * *
Based upon the findings of fact, the Full Commission concludes as follows:
CONCLUSIONS OF LAW
1. Plaintiff's average weekly wage of $555.87 yields a compensation rate of $370.60.
2. On December 13, 1991, plaintiff was performing work subcontracted to him under defendant's contract with Pat Dyer. In that defendant did not obtain a certificate of workers' compensation insurance coverage from plaintiff, defendant is liable for any benefits that might become due to plaintiff under the Workers' Compensation Act for compensable injuries sustained by plaintiff during the performance of the sub-contract. N.C. Gen. Stat. § 97-19.
3. On December 13, 1991, plaintiff sustained an injury by accident arising out of and in the course of his subcontractual relationship with defendant. N.C. Gen. Stat. §§ 97-2, 97-19;Culpepper v. Fairfield Sapphire Valley, 93 N.C. App. 242 (1989).
4. As a result of his injury by accident, plaintiff has incurred medical expenses for treatment rendered which was reasonably necessary to effect a cure or give relief, including the surgical procedures performed for his shoulder impingement syndrome and his carpal tunnel syndrome. N.C. Gen. Stat. §97-25.
5. Plaintiff has failed to prove by the greater weight of the evidence that he has suffered any diminution of his wage earning capacity such that he would be entitled to temporary partial disability benefits. N.C. Gen. Stat. § 97-30.
6. As a result of his injury by accident, plaintiff was temporarily totally disabled from July 7, 1992 through July 17, 1992, when he could return to work in his supervisory capacity. N.C. Gen. Stat. § 97-29.
7. As a result of his injury by accident, plaintiff has sustained a ten percent permanent impairment to his right upper extremity for which he is entitled to twenty-four weeks of compensation at the rate of $370.60 per week. N.C. Gen. Stat. §97-31 (13).
8. As a result of his injury by accident, plaintiff has sustained a fifteen percent permanent impairment to his right hand for which he is entitled to thirty weeks of compensation at the rate of $370.60 per week. N.C. Gen. Stat. § 97-31 (12).
* * * * * * * * * * * * * * * * * *
Based on the foregoing findings of fact and conclusions of law, the Full Commission affirms the holding of the Deputy Commissioner and enters the following:
AWARD
1. Defendant shall pay all medical expenses incurred by plaintiff as a result of his injury by accident for treatment rendered which is reasonably necessary to effect a cure, give relief, or lessen any period of disability.
2. Defendant shall pay plaintiff compensation at the rate of $370.60 per week for one and four-sevenths weeks (11 days) as temporary total disability compensation. This amount shall be paid in a lump sum, subject to a reasonable attorney's fee approved hereafter.
3. Defendant shall pay plaintiff compensation at the rate of $370.60 per week for twenty-four weeks for his ten percent permanent impairment to his right upper extremity. This amount shall be paid in a lump sum, subject to a reasonable attorney's fee approved hereafter.
4. Defendant shall pay plaintiff compensation at the rate of $370.60 per week for thirty weeks for his fifteen percent permanent impairment to his right hand. This amount shall be paid in a lump sum, subject to a reasonable attorney's fee approved hereafter.
5. A reasonable attorney's fee in the amount of twenty-five percent of the total compensation due plaintiff under this award is approved for plaintiff's counsel, to be deducted from the lump sum due plaintiff and paid directly to plaintiff's counsel.
6. Defendant shall pay the costs.
 S/ ____________________________ COY M. VANCE COMMISSIONER
CONCURRING:
S/ ______________________ THOMAS J. BOLCH COMMISSIONER
S/ ______________________ DIANNE C. SELLERS COMMISSIONER
CMV/cnp/rst 3/21/97